THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN R. GRABOFF, M.D.,

              Plaintiff,

    v.

THE COLLERAN FIRM, et al.,

              Defendants.

CIVIL ACTION
NO. 10-1710

**OPINION**

**Slomsky, J.**                                          **March 28, 2013**

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 2

    A.  The AAOS Bylaws and Background Information ...................................... 6

        1.  Standards of Professionalism ............................................................ 8

        2.  Grievance Procedure ......................................................................... 9

    B.  Testimony of Dr. Peter Mandell ............................................................... 11

    C.  Testimony of Karen Hackett ..................................................................... 12

    D.  Testimony of Dr. Michael Parks ............................................................... 13

    E.  Testimony of Dr. Steven Graboff .............................................................. 15

        1.  The AAOS Article ........................................................................... 19

        2.  Dr. Graboff Describes the False Information In, and Impressions From, the

            AAOS Article ................................................................................... 20

3.  Dr. Graboff Describes the Impact the Article had on His Career ................. 22

F.  Deposition Testimony of Richard Scott, Esquire, Kevin McGowen, Esquire and

Steven Levine, Esquire ........................................................................................... 23

G.  Testimony of Gregory Cowhey ................................................................................ 24

III. STANDARD OF REVIEW ............................................................................................. 25

IV. DISCUSSION ..................................................................................................................... 28

A.  False Light Claim .......................................................................................................... 28

1.  Choice of Law Analysis ....................................................................................... 28

2.  Actual Falsity is Not a Required Element of a False Light Claim ................. 29

3.  The Evidence is Sufficient to Prove the False Light Claim ........................... 34

4.  Publication of the AAOS Article to the Public on the Internet is

Not Privileged ....................................................................................................... 35

B.  Doctrine of Economic Necessity ............................................................................... 37

1.  Choice of Law Analysis ....................................................................................... 37

2.  The Doctrine of Economic Necessity is Not a Defense to a

False Light Claim ................................................................................................... 39

3.  Plaintiff Has Proven an Economic Necessity ................................................... 40

V.  CONCLUSION ................................................................................................................... 45

## I.   INTRODUCTION

On April 12, 2012, a twelve-day jury trial commenced in this case.  On April 27, 2012, the Jury rendered a verdict in favor of Plaintiff Steven R. Graboff, M.D. ("Plaintiff" or "Dr. Graboff") and against Defendants American Academy of Orthopaedic Surgeons and American Association of Orthopaedic Surgeons (collectively "Defendant" or "AAOS").  The jury found that Defendants engaged in tortious conduct by portraying Dr. Graboff in a false light and awarded him $196,000 in damages.

AAOS is a private organization whose membership[1] is comprised primarily of orthopaedic surgeons.  In June 2009, Plaintiff, an orthopaedic surgeon and a forensic expert, was suspended from membership in the AAOS.  The events surrounding the suspension involved Plaintiff's work as an expert in a medical malpractice action.[2]

Before the Court is the Post-Trial Motion filed by Defendant AAOS, Pursuant to Federal Rules of Civil Procedure 50(b) and 59 for Judgment as a Matter of Law and Judgment Notwithstanding the Verdict.  (Doc. No. 137.)  In the Motion, Defendant argues first that the article it published about Dr. Graboff after his suspension did not contain any false statements.  AAOS contends that a false statement is an essential element of a false light claim.   Second, Defendant contends there is no evidence to support the Jury's verdict with respect to the false

---

[1] The AAOS has two categories of membership: fellows and members.  The difference between them relates to voting and committee rights in the organization and is not relevant to this Opinion.  Therefore, throughout this Opinion the Court will use the term "member" to refer to both members and fellows of the organization.

[2] Plaintiff was hired as an expert by Francis T. Colleran, Esquire, and his law firm, The Colleran Firm, in the case of Jones v. Meller, a medical malpractice action pending in the Court of Common Pleas of Philadelphia County.  Both Colleran and the firm were Defendants in the instant case (collectively the "Colleran Defendants").  The jury returned a verdict against them and awarded damages.  On July 30, 2012, the Colleran Defendants settled with Plaintiff and were dismissed from this case.

light claim.  Third, Defendant alleges a privilege in publishing the article about Dr. Graboff.

Finally, Defendant contends the doctrine of economic necessity as it applies to the affairs of a

voluntary association mandates judgment against Dr. Graboff in this matter.

Plaintiff filed a Response in Opposition to Defendant's Post-Trial Motion (Doc. No. 155),

and Defendant filed a Reply in Support of the Motion (Doc. No. 157).  The Motion is now ripe

for adjudication.  For reasons that follow, the Court will deny Defendant's Motion.

## II.    STATEMENT OF FACTS

Plaintiff is a board certified orthopaedic surgeon.  Since 1985, he has maintained an

active orthopaedic clinical practice, provided forensic orthopaedic consulting services and served

as an orthopaedic expert witness.  (Doc No. 1 ¶ 9-11.)  In 2005, Plaintiff was retained by a law

firm known as The Colleran Firm as an expert in the case Jones v. Meller, supra.  (Id. ¶ 12.)  On

December 7, 2005, he submitted a draft expert report summarizing his preliminary medical

conclusions in Jones about the work of Dr. Menachem Meller ("Dr. Meller"), the defendant in

that case.  (Id. ¶ 15.)  The report had the words "**DRAFT REPORT**" in bold, capital, underlined

letters below the title of the document and above the salutation, "Dear Mr. Colleran."  (Steven R.

Graboff, M.D. Trial Testimony ["Graboff"] April 13, 2012, 261:20-263:4; Graboff, April 16,

2012, AM Session, 9:15-23.)  Plaintiff was never asked to prepare a final report for The Colleran

Firm in the Jones matter.  (Doc No. 1 ¶ 18-19.)

On April 21, 2008, Plaintiff received notice from the AAOS of a Grievance filed against

him by Dr. Meller for alleged violations of their Standards of Professionalism on Orthopaedic

Expert Witness Testimony in connection with his expert report in Jones.  (Id. ¶ 27-28.)  Plaintiff

responded to the Grievance.  Thereafter, the AAOS Committee on Professionalism conducted an

evaluation of the grievance and found sufficient grounds to hold a hearing.  (Id. ¶ 30-31.)  In

preparing for the hearing, Plaintiff was provided with his report.  He noticed that the words

"**DRAFT REPORT**" had been deleted from his report and informed the Committee on

Professionalism about the deletion.  Plaintiff learned that the words "**DRAFT REPORT**" were

whited out by The Colleran Firm and used in settlement negotiations with Dr. Meller.  (Id. ¶ 35-

37.)  Dr. Graboff provided this information to the Committee on Professionalism prior to his

hearing date.

On October 24, 2008, Dr. Meller and Plaintiff attended the AAOS hearing in which his

actions in the Jones case were considered.  After the hearing, the Committee on Professionalism

issued its findings.  The Committee found: "Dr. Graboff gave false testimony, was not fair and

impartial, failed to evaluate the care at issue in light of generally accepted standards, and did not

exhibit knowledge about the standard of care for the condition at issue."  (Id. ¶ 40, 54.)  The

Committee recommended that Plaintiff be suspended from AAOS membership for two years.

(Id. ¶ 56.)

Plaintiff appealed the recommended suspension to the AAOS Judiciary Committee,

which also found a two year suspension was warranted.  (Id. ¶ 58, 64, 67.)  On June 20, 2009, the

AAOS Board of Directors reviewed the matter and voted to suspend Plaintiff from the AAOS for

two years for violating the Standards of Professionalism for Orthopaedic Expert Witness

Testimony.  (Id. ¶ 68-70.)  Thereafter, the AAOS published an article about Plaintiff's suspension

in the September 2009 issue of AAOS Now, an Association publication available to members in

hard copy and to the public and members electronically on the AAOS website.  (Id. ¶ 74; Karen

Hackett Trial Testimony ["Hackett"] April 19, 2012 ["4/19/12"], 198:6-21.)

On April 16, 2010, Plaintiff filed the instant action against two groups of Defendants.

First, Plaintiff alleged in the Complaint that the Colleran Defendants engaged in conduct that

constituted a breach of contract, negligence and breach of the duties of confidentiality and trust.[3] (Doc. No. 1, Counts I, II and III.)  These claims were dismissed as moot on July 31, 2012, after the Colleran Defendants settled with Plaintiff.  (Doc. No. 165.)  Second, Plaintiff asserted against the AAOS Defendants claims for breach of contract, tortious interference with contractual relations, commercial disparagement, defamation and false light invasion of privacy.  (Doc. No. 1, Counts IV, V, VI, VII, VIII).[4]  On April 13, 2012, the case proceeded to trial.

At the close of trial, the Court instructed the jurors on the remaining claims, including the false light invasion of privacy claim at issue here.  The Court stated, in relevant part, as follows:

> One who gives publicity to a matter concerning another person that places that other person before the public in a false light is responsible to that person for all harm suffered as a result of this publicity if
>
> a.  Publicizing matter of this kind about a reasonable person would be highly offensive to that reasonable person.
>
> b. The person giving the publicity acted with knowledge of the falsity of the matter or in reckless disregard of whether it was true or false.
>
> Conduct that is highly offensive to a reasonable person is conduct that a reasonable person, in similar circumstances, would find very objectionable or that a reasonable person in similar circumstances could be expected to take with serious offense.
>
> Publicity means that the matter is communicated to the public at large or to so many persons that the matter must be regarded as substantially certain to become public knowledge.

---

[3] The Jury made the following findings on the two claims that proceeded to trial:  the Jury found in favor of the Colleran Defendants on the breach of contract claim and against the Colleran Defendants on the negligence claim.  (Doc. No. 134.)

[4] The Jury made the following findings on the three claims that proceeded to trial:  the Jury found in favor of Dr. Graboff on the false light claim and in favor of the AAOS on the breach of contract, intentional interference with prospective contractual relations, and defamation claims.

(Doc. No. 157, Ex. A.)[5]

On April 27, 2012, the Jury returned the following verdict with respect to Plaintiff's false

light claim against the AAOS:

6.   Do you find that Dr. Steven Graboff proved by a preponderance of the evidence that the American Academy of Orthopaedic Surgeons and American Association of Orthopaedic Surgeons ("AAOS") made statements in AAOS NOW about Dr. Steven Graboff that:

(a)  Were false?

_____ YES          ____X____ NO

(b)  Portrayed Dr. Graboff in a false light?

____X____ YES          _____ NO

*If your answer to Question No. 6(a) or 6(b) is "YES", please proceed to Question No. 7.  If your answer to Question No. 6(a) or 6(b) is "NO", please proceed to Question No. 9.*

7.   Do you find that the American Academy of Orthopaedic Surgeons and American Association of Orthopaedic Surgeons ("AAOS") knew or acted in reckless disregard for the truth or untruth of the statements in AAOS NOW that were false or portrayed Dr. Steven Graboff in a false light?

____X____ YES          _____ NO

*If your answer to Question No. 7 is "YES", please proceed to Question No. 8.  If your answer to Question No. 7 is "NO", please proceed to Question No. 9.*

8.   Do you find that Dr. Steven Graboff proved by a preponderance of the evidence that the statements in AAOS NOW that were false or portrayed him in a false light caused him harm?

____X____ YES          _____ NO

(Doc. No. 138-1.)  The Jury awarded Plaintiff $140,000 for past loss of earnings and $56,000 for

non-economic losses.  (Id.)

_____

[5] This instruction on the false light claim is set forth in the Pennsylvania Suggested Standards Jury Instruction (Fourth Edition), Section 17.220.

On May 3, 2012, the Court entered judgment in favor of Plaintiff and against AAOS on the false light claim alleged in Count VIII of the Complaint.  (Doc. No. 102.)

Testimony of several witnesses at trial is relevant to the issues raised by AAOS in the Post-Trial Motion.  Dr. Peter Mandell, Karen Hackett and Dr. Michael Parks discussed the evolution of the AAOS committees and standards on expert testimony and how they were applied to Plaintiff.  In turn, Plaintiff testified about his suspension, the <u>AAOS Now</u> article and the impact of these events on his career.  In addition, deposition testimony of three former clients of Plaintiff was read at trial to demonstrate the impact of the AAOS suspension on him.  Finally, an expert witness testified about the economic loss suffered by Plaintiff as a result of the suspension.  A discussion of pertinent testimony of these witnesses and the regulations and standards of professionalism of the AAOS follows.

**A.  The AAOS Bylaws and Background Information**

The AAOS Bylaws contain twenty articles, each containing multiple subsections. (Pl. Ex. 36 at 114, April 23, 2013 Trial Transcript, 147:14-21.)  Article II of the Bylaws state the goal of the organization: "The purpose of the association shall be to promote the interest of musculoskeletal patients, and the profession of orthopedic surgery."  (Karen Hackett Trial Testimony ["Hackett"] April 19, 2012 ["4/19/12"], at 180:21-23.)  According to Karen Hackett, the Chief Executive Officer ("CEO") of the AAOS, the Bylaws create a contract between the organization and its members, which govern what is required to become a member, maintain membership and fit within the membership categories.  (<u>Id.</u> at 180.)  Article V of the Bylaws states in relevant part:

5.6  Governed by Illinois Law

Membership status in the ASSOCIATION is governed by the law of the State of Illinois, where the offices of the ASSOCIATION are located.  That law provides

6

> that an applicant may not seek judicial review of an adverse membership decision except where membership is an economic necessity. Every aspect of the application and election process shall also be governed by the law of the state of Illinois.

(Pl. Ex. 36 at 114, April 23, 2013 Trial Transcript, 147:14-21.)

In 2002, the AAOS Board of Directors created the AAOS Expert Witness Program under the direction of the Expert Witness Project Team in response to what the orthopedic community perceived to be a "medical malpractice crisis." (Dr. Peter J. Mandell January 17, 2012 Video Deposition Offered at Trial ["Mandell"] on April 19, 2012 ["4/19/12"], 135:2-7 at 128.) This crisis was happening in several states and was first brought to the attention of the AAOS by Florida members who complained that expert witnesses were causing a "ruckus." (Id.) These members explained that other medical organizations had programs on expert witnesses, which led the AAOS to assume there was an expert witness problem. (Id.; Hackett, 4/20/12 at 11-15.) Dr. Peter Mandell, a member of the Expert Witness Project Team, described the crisis as high jury awards in medical malpractice cases resulting in high premiums for medical malpractice insurance. (Mandell, 4/19/12 at 131:5-132:25.) One goal of the Expert Witness Project Team was "[t]o be responsive" to the desire of members to effectively address "the 'Expert Witness Problem' through various methods and strategies." (Id. at 134:1-6.) Dr. Mandell defined the expert witness problem as "[e]xpert witnesses that didn't tell the truth, the whole truth, and nothing but the truth." (Id.)

The AAOS Expert Witness Project Team recommended the creation of the Committee on Professionalism[6] and the Judiciary Committee to handle the crisis through implementation of new programs and standards. (Id.)

---

[6] The Committee on Professionalism "is the AAOS body responsible for reviewing and adjudicating grievances of alleged violations of the Standards of Professionalism and developing a recommendation for the professional compliance action to be taken by the AAOS Board of

1.        **Standards of Professionalism**

In 2005, the Standards of Professionalism were adopted by the AAOS.  (Hackett, 4/19/12

at 188-89.)  The AAOS Bylaws were amended to add Article XIX, which contains the Standards

of Professionalism.  (Pl. Ex. 36 at 141-42, April 23, 2013 Trial Transcript, 147:14-21.)  The

Standards of Professionalism include standards for orthopaedic expert witness testimony.

(Hackett, 4/19/12 at 187-88.)  In 2002, when the Committee on Professionalism was conceived

to create these Standards, the sole focus was on expert witness issues.  (Hackett, 4/20/12 at

52:16-53:4.)  Prior to the creation of the Committee on Professionalism, the formal position of

the AAOS was that it had no interest in setting standards about expert witness testimony of its

members.  (Hackett, 4/20/12 at 254:3-6.)

The following Standards of Professionalism for Orthopaedic Expert Witness Testimony

are relevant to the grievance against Dr. Graboff:

1.   An orthopaedic expert witness shall not knowingly provide testimony that is
     false.

2.   An orthopaedic expert witness shall provide opinions and/or factual testimony
     in a fair and impartial manner.

3.   An orthopaedic expert witness shall evaluate the medical condition and care
     provided in light of generally accepted standards at the time, place and in the
     context of care delivered.

4.   An orthopaedic expert witness shall neither condemn performance that falls
     within generally accepted practice standards nor endorse or condone
     performance that falls outside these standards.

5.   An orthopaedic expert witness shall state how and why his or her opinion
     varies from generally accepted standards.

. . .

7.   An orthopaedic expert witness shall have knowledge and experience about the

Directors." (Doc. No. 80-5 at 3.)  The Committee was established in 2005 with Dr. Mandell as
the first Chair.  (Mandell, 4/19/12 at 133.)

standard of care and the available scientific evidence for the condition in question during the relevant time, place and in the context of medical care provided and shall respond accurately to questions about the standard of care and the available scientific evidence.

8. An orthopaedic expert witness shall provide evidence or testify only in matters in which he or she has relevant clinical experience and knowledge in the areas of medicine that are the subject of the proceeding.

9. An orthopaedic expert witness shall be prepared to state the basis of the testimony presented and whether it is based on personal experience, specific clinical or scientific evidence.

(Doc. No. 14-3, 14-15.)

## 2.    Grievance Procedure

Article VIII of the AAOS Bylaws, entitled Professional Compliance Program, governs professional compliance actions against AAOS members for violations of the Standards of Professionalism.  (Doc. No. 80-4 at 31-32.)  Section 8.2 states that a "Member of the ASSOCIATION may face a professional compliance action for . . . [f]ailure to comply with the ASSOCIATION Standards of Professionalism."  (Doc. No. 80-4 at 31.)  Section 8.4 provides that if a member does not adhere to one or more of the Standards of Professionalism, another AAOS member can file a grievance against the accused.  (Mandell, 4/19/12 at 135:2-7; Doc. No. 80-4 at 32.)  Section 8.4 describes the procedures for handling a grievance.  (Doc. No. 80-4 at 32.)

The process works in the following manner.  AAOS Office of General Counsel first reviews the grievance to ensure there are no HIPAA[7] violations or other perfunctory errors. (Mandell, 4/19/12 at 140:19-20.)  The accused member is then notified and provided a copy of the grievance and any related materials, the Standards of Professionalism and the procedures. (Id. at 142:23-143:4.)  The accused is given an opportunity to file a response, which may include a factual recitation and supporting paperwork.  The Committee on Professionalism then conducts

---

[7] "HIPAA" is an acronym for "Health Insurance Portability and Accountability Act" and concerns the privacy rights of medical patients.

a prima facie evaluation of the grievance and all materials provided by the accuser and accused to determine whether there is enough material to warrant a hearing.  (Id. at 140:19-25.)  The compliance procedures provide that the "Committee on Professionalism will review the materials submitted by the grievant and it may further investigate to determine whether the grievance is appropriate for committee review."  (Id. at 138:12-16.)  All members of the Committee participate in the decision on whether there is a prima facie case unless a member recuses himself or herself because of a conflict.  (Id. at 140-44.)  Both parties are then notified of the decision of the Committee.  (Id.)

If a hearing is warranted, Dr. Peter Mandell, as the Committee Chair, creates a hearing panel — consisting of Committee on Professionalism members — to conduct a hearing and make a recommendation regarding discipline.  (Hackett, 4/19 at 85-86.)  The accused may appeal this recommendation to the Judiciary Committee, which will then hold a hearing and make a recommendation.  (Id. at 73.)  These two recommendations are reviewed by the AAOS Board, which makes the final determination regarding discipline.  (Id.)  There are three levels of discipline.  They are censure, suspension and expulsion.  (Id. at 192; see also Doc. No. 80-4 at 31.)

AAOS Bylaw Section 8.6, titled "Notification," provides that if an accused member is disciplined after going through the above outlined process, certain entities must be notified.  (Hackett, 4/19/12 at 197-99.)  Specifically, the notification section states: "At least annually the association shall notify . . . members of all professional compliance actions taken, identifying the respondent by name."  (Id. at 198:1-5.)

### B.  Testimony of Dr. Peter Mandell

Dr. Peter Mandell is an orthopaedic surgeon.  He stopped performing surgery in order to focus on treating patients and serving as an expert in workers compensation cases on behalf of insurance companies.  (Dr. Peter J. Mandell January 17, 2012 Video Deposition Offered at Trial ["Mandell"] on April 19, 2012 ["4/19/12"], 124-25.)  Dr. Mandell became a member of the AAOS in 1979.  (<u>Id.</u> at 129.)  Since February or March 2009, Dr. Mandell has served as the Chair of the AAOS Council on Advocacy.  (<u>Id.</u> at 127:3-4.)  One issue the Council on Advocacy handles is lobbying in Washington D.C. for medical liability reform.  (<u>Id.</u>)  As part of his role as the Chair of the Council on Advocacy, Dr. Mandell is involved in the AAOS Political Action Committee, which makes political contributions to members of Congress.  (<u>Id.</u> at 128.)  Dr. Mandell also served as a member of the AAOS Expert Witness Project Team, which was created in response to the perceived "medical malpractice crisis" and developed the Committee on Professionalism, Judiciary Committee, Professional Compliance Program and Standards on Professionalism.  (<u>Id.</u> at 128-134.)

In Dr. Graboff's case, Committee members found there was sufficient evidence to warrant a hearing, which was held and resulted in the recommendation of a two year suspension. (<u>Id.</u> at 166.)  Dr. Graboff appealed this decision to the Judiciary Committee, which also recommended a two year suspension.  (<u>Id.</u>)  The AAOS Board of Directors ultimately voted to suspend Dr. Graboff for the two year period.  (<u>Id.</u>)

The suspension was published in an article in <u>AAOS Now</u>.  (<u>Id.</u> at 166:6-8.)  Dr. Mandell testified that the purpose of publication is "[t]o report to the [AAOS membership] what has transpired in grievance hearings like Dr. Graboff's."  He agreed that the AAOS rules do not

require <u>AAOS Now</u> articles on discipline of members to be made available to the general public.

(<u>Id.</u> at 167:2-168:10, 170-71.)

 <u>AAOS Now</u> began publishing in 2005 and is a bulletin sent to all AAOS members.  (<u>Id.</u>

at 166-69.)  It has been posted on the AAOS website since its inception.  (<u>Id.</u>)  When <u>AAOS Now</u>

was established, the AAOS did not intend to keep the publication a secret, but never actively

discussed publishing it on the internet.  (<u>Id.</u>)

 The AAOS website requires a password to access certain information, but access to

<u>AAOS Now</u> articles is not password protected.  (<u>Id.</u>)  Therefore, if an individual uses a search

engine, such as Google, to search for "Steven A. Graboff," one can readily find and read the

<u>AAOS Now</u> article published about Dr. Graboff.  (<u>Id.</u>)  Dr. Mandell testified that the AAOS was

not "disappointed that [the <u>AAOS Now</u> article about Dr. Graboff] could be found on Google . . .

[because] [t]he truth is the truth.  If Dr. Graboff was suspended for two years, that's something

that we felt people who were interested in Dr. Graboff should know about."  (<u>Id.</u> at 168:16-23.)

### C.  Testimony of Karen Hackett

 Karen Hackett ("Hackett") is the CEO of the AAOS.  She is responsible for overseeing

250 staff members. (Karen Hackett Trial Testimony ["Hackett"] April 19, 2012 ["4/19/12"], 176-

77.)  The primary office of the AAOS is located in Rosemont, Illinois.  The organization has

approximately 36,000 members worldwide.  (<u>Id.</u>)  The AAOS consists of two organizations, an

Association and an Academy.  (<u>Id.</u> at 178.)  The Academy's primary purpose is to further the

education of members and to engage in research.  (<u>Id.</u> at 178, 181-82.)  The Association focuses

on membership activities, the Professional Compliance Program, as well as advocacy in areas

such as medical reimbursement, the healthcare reform, medical liability reform, increased

research funding and public service announcements.  (<u>Id.</u>)

Hackett reports to the AAOS Board of Directors, which is responsible for, among other things, making all changes to the AAOS Bylaws.  (Id. at 179.)  In 2005, the Bylaws were amended to include the Standards of Professionalism.  (Id. at 192:20-193:8.)  Hackett explained the amendment was based on the notion that "orthopedic surgeons are really the only ones who can tell if someone is testifying accurately . . . [and] the legal system can't do that.  And it isn't within the purview of the American Board of Orthopaedic Surgery[8] [which certifies orthopaedic surgeons to practice medicine] or other organizations . . . to do that . . . . [Further,] the courts, unless they're orthopedic surgeons, really wouldn't have a good handle on whether someone is testifying accurately or not."  (Id.)

AAOS notifies members of professional compliance actions, in accordance with its Bylaws, through articles in the AAOS monthly magazine, AAOS Now.  (Hackett, 4/19/12 at 198:13-21.)  Since the inception of AAOS Now, it has been circulated to members in hard copy and available on the internet at the AAOS website.  (Id. at 198:13-21.)  Approximately 75% of the AAOS website is available to the public, including all AAOS Now articles related to disciplinary actions which total approximately 27 cases.  (Id. at 198:22-199:1, 200:11-12).  A portion of the AAOS website, however, is password protected.  (Id.)  By logging into the website using their membership password, AAOS members can access the membership directory, information on the committee appointment process, job placement information, and information about government relations and advocacy.  (Id. at 201:11-25.)

### D.  Testimony of Dr. Michael Parks

Dr. Michael Parks is an orthopaedic surgeon who, since 1997, has performed joint replacements of the hip and knee.  (Dr. Michael Parks Trial Testimony ["Parks"] April 20, 2012

---

[8] The American Board of Orthopaedic Surgery is a separate organization from the AAOS.

["4/20/12"], 116-17.)  Dr. Parks has been a dues-paying AAOS member since 2000 or 2001,

teaches courses for doctors and has served on the AAOS Board for two years.  (Id. at 118, 124-

25.)  According to Dr. Parks, about fifteen members serve on the Board of Directors at any given

time.

Board members are responsible for reviewing disciplinary appeals in order to make a

final determination based on alleged violations of the Standards of Professionalism.  (Id. at 127-

28.)  The purpose of implementing the Standards of Professionalism was to police members

because there "were a lot of experts who were giving nonfactual, inaccurate information."  (Id. at

135:22-25, 136.)

Dr. Parks reiterated the stages of appeal from the Committee on Professionalism to the

Judiciary Committee to the AAOS Board of Directors.  (Id. at 128.)  In advance of Board

meetings, Board members receive voluminous materials to review related to the disciplinary

proceedings including the grievance, medical records, as well as hearing transcripts and reports

from the Committee on Professionalism and Judiciary Committee.  (Id. at 127-29.)  Parties to the

grievance are provided an opportunity to attend Board meetings and make a statement.  (Id. at

133-34.)

Dr. Parks was on the Board of Directors in June 2009 when the Board reviewed the case

of Dr. Graboff.  (Id. at 138-40.)  Dr. Parks summarized Dr. Graboff's report which involved a

patient with an infected femur and osteomyelitis.  (Id. at 141-53.)  Dr. Parks disagreed with the

report because he found that parts of it were "biased," contained "mistakes," and were not valid

opinions because Dr. Graboff did not have all the necessary information, such as the x-rays.  (Id.

at 141-53.)  The AAOS Board did not take into consideration the credibility of Dr. Meller in

assessing his grievance against Dr. Graboff.  (Id. at 192.)  While Dr. Graboff had the right to

attend the Board meeting about his case, he chose not to attend.  (Id. at 166-68.)   The AAOS

Board unanimously voted to sustain the recommendation of the Committee on Professionalism

and Judiciary Committee and to suspend Dr. Graboff for two years.  (Id. at 168-69.)  Dr. Parks

believes the suspension of Dr. Graboff was appropriate because he violated the AAOS Standards

of Professionalism.  (Id.)

### E.  Testimony of Dr. Steven Graboff

Dr. Graboff is a board certified orthopaedic surgeon who was a member of the AAOS.

(Steven R. Graboff, M.D. Trial Testimony ["Graboff"] April 13, 2012 ["4/13/12"], 144:6-12.)

Dr. Graboff graduated from medical school in 1980, completed an internship in general surgery,

a residency in orthopaedics and began his private orthopaedic practice in 1985.  (Id. at 117:22-

118:15.)  On September 10, 1987, Dr. Graboff submitted an AAOS membership application,

which was accepted.  (Id. at 120-21.)  Beginning in early 2000, Plaintiff made the decision to

slowly phase out his surgical practice and focus on his forensic work.  (Id. at 125:1-25.)  By

January 1, 2005, Plaintiff planned to stop performing surgery and dedicate his career to forensic

work relating to medical-legal issues.  (Id. at 126:1-10.)

Plaintiff began working as an expert witness for the Colleran Defendants in the 1990's

and estimates he has provided assistance on at least 50 cases.  (Id. at 138:2-13.)  In addition,

before his suspension, Plaintiff did forensic work in medical malpractice cases for law firms

located in Alaska, Hawaii, Nevada, New Mexico, New York, Pennsylvania, Puerto Rico, Texas

and Utah.  (Id. at 143:16-144:6.)  His name was widely disseminated in the legal community

because he was one of few experts willing to testify on behalf of plaintiffs against other

orthopaedic surgeons.  (Id. at 143:16-144:6.)  Plaintiff was also retained by insurance carriers as

a defense expert in personal injury actions.  (Graboff, April 16, 2012, AM session ["4/16/12"], 114:14-17.)

On January 14, 2006, Andrea Mednick of Mednick & Associates, a medical-legal listing service, contacted Dr. Graboff about the Jones v. Meller case.  (Graboff, 4/13/12 at 141:21-142:7, 147:19-150:16, 159:24-160:25.)   Mednick sent him a letter from The Colleran Firm summarizing the Jones case, enclosing medical records — which did not include all medical records related to the case — and requesting that Plaintiff review the material in order to draft a Certificate of Merit, which under Pennsylvania law is a document stating that a case of professional negligence for breaching a standard of care has merit.  (Id. at 120-21, 140-41, 146.) Dr. Graboff believed, based on the letter from The Colleran Firm, that the law firm wanted him to give his expert opinion on whether Dr. Meller committed professional negligence when he left an item called a cerclage wire inside Jones during surgery.  (Id. at 141-160.)  On February 17, 2006, Plaintiff wrote a letter to Denine Moscariello, Esquire, of The Colleran Firm explaining that he reviewed the records and found the case to be meritorious, without stating his opinion to any degree of medical certainty.  (Id. at 163:6-164:25, 201:19.)  He also sent The Colleran Firm a Certificate of Merit.  (Id.)

Dr. Graboff was not contacted again about the Jones matter until November 2007, nearly two years later, when Mednick sent him additional materials and requested that he write a report as soon as possible. (Id. at 202:1-9, 205:1-14, 207: 3-21.)  On December 4, 2007, Dr. Graboff had his assistant, Laurie Rye, contact The Colleran Firm and request x-ray studies that had not been sent with the request for the report.[9]  Dr. Graboff then proceeded to draft the December 5,

---

[9] Rye's deposition testimony was read into the record at trial.  During her testimony, Rye stated that she wrote the following note on the Jones file: "Left a message on Denine Moscariello's voicemail requesting all x-ray studies."  (Laurie Rye, April 19, 2012, at 100-101.)  Rye believes

2007 report.  He labeled it "**DRAFT REPORT**" because he "didn't have everything [he] needed yet to finalize it."  (Id. at 207:22-208:3, 211:21.)  Dr. Graboff subsequently created a second draft report incorporating changes from Francis Colleran.  (Id. at 257.)  This report also contained the words "**DRAFT REPORT**" in bold, capital, underlined letters below the title "Medical-Legal Report/Review of Record" and above the salutation "Dear Mr. Colleran" because Dr. Graboff still needed the additional materials he had requested before issuing a final report.  (Id. at 261:20-263:4; Graboff, 4/16/12, AM Session, 9:15-23.)

In April 2008, Dr. Graboff received a package of materials from the AAOS notifying him that Dr. Meller filed a Grievance against him.  (Graboff, 4/13/12 at 266.)  On May 30, 2008, Dr. Graboff responded to the accusations of Dr. Meller in a letter to General Counsel of the AAOS, Richard Peterson, reiterating that his December 5, 2007 expert report was a draft and refuting Dr. Meller's allegations with support from a scientific article.  (Graboff, 4/16/12, AM session at 49:1-50:21.)  Dr. Graboff then received notice from the AAOS that it determined there was a bona fide Grievance against him and a hearing would be held on October 24, 2008.  (Id. at 51.)

In preparing for the hearing, Dr. Graboff discovered that his report, which Dr. Meller submitted to the AAOS and was the basis for the Grievance, had been altered.  The words "**DRAFT REPORT**" had been deleted from the report.  (Id. at 9:15-23; 51:10-52:7.)  When Dr. Graboff learned the "**DRAFT REPORT**" language was removed, he wrote a supplemental letter to the AAOS explaining that the report was a preliminary document and that it had been altered.  (Id. at 52:14-24.)  Dr. Graboff then spoke to Francis Colleran, Esquire, about the change to his report and was told The Colleran Firm had altered the report for purposes of settling the case.

---

the reason she called Moscariello of The Colleran Firm rather than making her request through Mednick is "[b]ecause it was urgent; it was something that needed to be done quickly."  (Id. at 103.)

(Id. at 53:12-16.)  Dr. Graboff asked Francis Colleran to provide him with a letter stating that the report was altered and Colleran provided such a letter on October 15, 2008.  (Id. at 54-57.)  Dr. Graboff received Colleran's letter the week prior to the October hearing and planned to provide it to the panel at the hearing.  (Id.)

On October 24, 2008, the Committee on Professionalism conducted a hearing in Rosement, Illinois, on the Grievance filed by Dr. Meller.  (Id. at 61-72; 79.)  Drs. Graboff and Meller were present at the hearing before the panel of orthopaedic surgeons and AAOS lawyers and were warned not to present any new evidence.  (Id.)  First, Dr. Meller had thirty minutes to present his case, which consisted of two witnesses and a power point presentation of x-rays and CAT scans.  (Id.)  Dr. Meller's presentation included material not provided to Dr. Graboff in advance of the hearing, such as x-rays of Jones showing that the cerclage wires were embedded in his leg rather than around the bone.  (Id.)  Dr. Graboff was then given an opportunity to ask Dr. Meller questions.  Next, Dr. Graboff had thirty minutes to present his case.  (Id.)  The panel did not allow Dr. Graboff to introduce the letter from Francis Colleran, Esquire, regarding the alteration of his expert report because it was not submitted prior to the hearing as required by the rules governing the hearing.  (Id.)  After the presentation by Dr. Graboff, Dr. Meller asked questions.  (Id.)  The panel of orthopaedic surgeons then asked questions, which were all directed to Dr. Graboff.  (Id.)  On December 23, 2008, the Committee sent Dr. Graboff their report, concluding that Dr. Graboff violated certain Standards[10] and should receive a two year suspension from the AAOS.  (Id. at 74-77.)

Dr. Graboff retained a lawyer and appealed the recommendation to the Judiciary Committee.  (Id. at 81.)  He informed Francis Colleran of the recommendation to suspend him

---

[10] The panel unanimously found Dr. Graboff violated standards 1-5 and the majority found he violated standard 7.  (Id. at 78.)  These Standards are set forth above.

and his appeal, and requested another letter detailing the alteration to his draft report.   (Id. at 82-83.)  On February 6, 2009, Francis Colleran provided Dr. Graboff with another letter, which he forwarded to his attorney and the Judiciary Committee.  (Id.)

On February 28, 2009, the Judiciary Committee held a hearing in Las Vegas, Nevada, with Dr. Meller and Dr. Graboff in attendance.  (Id. at 84-85; Graboff, 4/17/2012 at 24-34.)  Both doctors made presentations to the Committee.  (Graboff, 4/16/12, AM session at 85.)   The Committee agreed with the decision of the Committee on Professionalism and recommended the two year suspension.  (Graboff, 4/17/2012 at 43-49.)  In June 2009, the Board reviewed the recommendations of the Committee on Professionalism and the Judiciary Committee and made the final decision to suspend Dr. Graboff from the AAOS for two years.  (Id.; Graboff, 4/13/12 at 109.)

### 1.   The AAOS Article

In September 2009, an article about the discipline of Dr. Graboff was published in an issue of AAOS Now.  As noted previously, AAOS Now is a publication circulated to AAOS members through the mail.  (Graboff, 4/13/12 at 112:11-15.)  In addition, the association has a website, a portion of which is available to the public and the remainder of which requires a member to log in with a username or AAOS ID number and password.  (Id. at 112:16-113:14.)  The AAOS Now article about Dr. Graboff's suspension is available on the public portion of the AAOS website at:  http://www.aaos.org/news/aaosnow/sep09/youraaos5_graboff.asp.  (Doc. No. 138, Ex. D)  As a result, the article about Plaintiff is accessible by using an online search engine, such as Google or Bing, and by searching key word phrases such as "AAOS Graboff," "AAOS sanctions," "AAOS grievance," "Dr. Graboff," "Steven Graboff," and "Steven R. Graboff, M.D." (Graboff, 4/13/12 at 113:15-114:4.)

2.      **Dr. Graboff Describes the False Information In, and Impressions From, the AAOS Article**

Plaintiff testified at trial about the content of the AAOS article.  Initially, he said:

There are many parts of [the <u>AAOS Now</u> article] that are flat out false, are misrepresentations and are not true.  And then, probably most importantly, when you read it from start to end, the context of the way it's written534 N.E.2d 987, the way they cut and paste the various things that they pulled out of the different hearings, the whole thing reads in a false way and so that's the way its interpreted.

(Graboff, 4/13 at 114:22-115:8.)  He then testified about each portion of the <u>AAOS Now</u> article

that he believed to be false or conveyed a false impression.  His testimony is summarized in the

following chart, which contains excerpts and omissions from the article and Plaintiff's testimony

about each one.

| STATEMENT FROM <u>AAOS NOW</u> ARTICLE | TESTIMONY OF DR. GRABOFF REGARDING FALSITY |
|---|---|
| The article describes the report of Dr. Graboff as a "medical-legal written report."  (Doc. No. 138, Ex. D.) | Plaintiff submits the phrase "medical-legal written report" "has tremendous significance as compared to a draft report" and the article omits the crucial fact that the report was a draft.  (Graboff, 4/16/12, AM session at 103:17-20.) |
| The article states that the Committee on Professionalism "found no written documentation that Dr. Graboff considered the report's opinions to be preliminary, that he requested all medical records and radiological studies, or that he informed the attorney he would not produce a final opinion or testify until he had reviewed all records." (Doc. No. 138, Ex. D.) | Plaintiff submits there is ample written evidence that the report was a draft in the form of a September 2008 letter from Dr. Graboff to the Committee on Professionalism as well as two letters from Francis Colleran stating that the report was a draft that his firm altered. (Graboff, 4/16/12, AM session at 104:16-105:18.) |
| The article does not contain information about the evidence Dr. Graboff presented to the Committee on Professionalism.  (Doc. No. 138, Ex. D.) | Plaintiff submits the omission of this information demonstrated that the article "doesn't accurately reflect what took place at the hearings."  (Graboff, 4/16/12, AM session at 104:16-105:18.) |
| The article states that "[t]he two cerclage wires, which were embedded in bone, were not removed."  (Doc. No. 138, Ex. D.) | Plaintiff submits this statement is "misleading" and "false" because Dr. Graboff did not know the wires were embedded in the bone when he drafted the report.  (Graboff, 4/16/12, AM session at 67:11-68:10.) |

| | |
|---|---|
| The article states that "Multiple comorbidities noted include severe anemia, type 2 diabetes mellitus, hypertension, peripheral vascular disease, tobacco and alcohol abuse and past history of marijuana, crack cocaine use." (Doc. No. 138, Ex. D.) | Plaintiff submits this statement takes "information that was only learned at the committee hearings and [wrote] it in such a way that it looks like [Dr. Graboff] knew about it before [he] wrote [the] report." (Graboff, 4/17/12 at 64:12-25). Dr. Graboff contends this excerpt is an "absolute falsification of the facts." (Graboff, 4/17/12 at 65:10-11.) |
| The article states that Jones "received 8 weeks of intravenous antibiotics," and that he showed no sign of infection.  (Doc. No. 138, Ex. D.) | Plaintiff submits that these statements are "misleading" and "false" because Dr. Graboff did not know this information when he drafted the report.  (Graboff, 4/17/12 at 69:14-21, 69:22-70:4.) |
| The article states that Dr. Graboff found that "the presence of the hardware prevented curing of the patient's femoral osteomyelitis."  (Doc. No. 138, Ex. D.) | Plaintiff submits, to the contrary, that his report indicates that Dr. Meller may have been able to cure the soft tissue infection, which is different from the bone infection known as osteomyelitis, which he did not address in his report.  (Graboff, 4/17/12 at 62-64.) |
| The article states Dr. Graboff "acknowledged that removing all hardware from an infected femur is not always possible."  (Doc. No. 138, Ex. D.) | Plaintiff submits this language twists his words because it implies that his opinion is that it is always possible to remove infected hardware, and this was never his opinion.  (Graboff, 4/17/12 at 76:1-9.) |
| The article states "Dr. Graboff further admitted his report had been based on lack of information and that the grievant had neither failed to meet the standard of care nor was responsible for the subsequent consequences in this case." (Doc. No. 138, Ex. D.) | Plaintiff submits this is a misleading statement because the phrase "lack of information" implies Dr. Graboff was derelict, inaccurate and intentionally sloppy rather than the truth which is that the report was preliminary and based on the limited information provided to him at the time.  (Graboff, 4/17/12 at 76:10-78:14.) |
| The article states Dr. Graboff admitted that Dr. Meller met the standard of care at the hearing. (Doc. No. 138, Ex. D.) | Plaintiff submits this is a "flat out falsification." (Graboff, 4/17/12 at 78:15-79:8.) |

Dr. Graboff testified that the <u>AAOS Now</u> article, when read in its entirety, leaves readers with the understanding that Plaintiff had access to information and materials when he wrote his report when, in fact, they were not given to him by The Colleran Firm before he completed his draft report.  (<u>Id.</u> at 104:22-105:2.)

21

### 3.   Dr. Graboff Describes the Impact the Article had on His Career

After Plaintiff was suspended from the AAOS and the <u>AAOS Now</u> article was published, a significant change in Dr. Graboff's business occurred.  (Graboff, 4/16/12, AM Session at 114:22-115:4.)  His client base diminished and not one of his 500 attorney and insurance carrier clients has retained him since the publication of the article.  (<u>Id.</u> at 116:9-14.)  Prior to the publication, Plaintiff did work for Allstate Insurance, USAA Insurance and Travelers Insurance.  (<u>Id.</u> at 114:18-115:12.)  After the publication, these insurers refused to retain Plaintiff.  (<u>Id.</u>)  The annual loss associated with these three accounts is approximately $500,000.  (<u>Id.</u> at 127:19-23.)  Moreover, since the <u>AAOS Now</u> article was released, every time Plaintiff testifies as an expert witness, he is questioned about his suspension from the AAOS.  (<u>Id.</u> at 115:18-116:4.)

On October 5, 2009, Joseph Crosby, a medical malpractice attorney who had retained Dr. Graboff in a case, sent a letter to Dr. Graboff.  (<u>Id.</u> at 118:8-120:23.)  This letter was admitted into evidence at trial and Dr. Graboff read the letter to the Jury, which provides in relevant part, "[a]s an expert who has testified in hundreds of cases, you are well aware of the disastrous influence your suspension for false testimony would have on our case.  You knew your honesty in prior testimonies would be closely scrutinized, yet you intentionally and recklessly hid this information. . . ."  (<u>Id.</u> at 120:6-25.)  The letter went on to request Dr. Graboff provide a full reimbursement of the expert fees he was paid or threatened to sue him for fees, attorney's fees and punitive damages.  (<u>Id.</u>)  Plaintiff received similar communications from other lawyers.  (<u>Id.</u> at 121: 3-7.)

Overall, Plaintiff's income has been diminished as a result of the AAOS suspension and he suffered a loss of job security.  (<u>Id.</u> at 121:25, 123:22.)  Dr. Graboff testified that:

> I really can't go back to doing what I . . . did before.  It would be a very, very arduous task to try and get back into that type of [orthopaedic surgery] practice again.  And the way medicine has changed over the past seven years, I could not

start up another practice again like I did back in 1985.  It's just impossible.  So
that's just not a realistic thing I could do.

(Id. at 124:12-20)  In short, Plaintiff testified that "even though [the AAOS] didn't take away my

right to do what I do, they gave the opposite side such a huge amount of ammunition that at some

point it's not worth it for attorneys to deal with me because I just have too much baggage."  (Id.

at 127:3-7.)  As a result, Plaintiff "developed a new smaller client base, not anywhere close to

[the previous base]."  (Id. at 116:9-14.)

### F. Deposition Testimony of Richard Scott, Esquire, Kevin McGowen, Esquire and Steven Levine, Esquire

At trial, deposition testimony for the following three attorneys was read into the record:

Richard Scott, Esquire; Kevin McGowen, Esquire; and Steven Levine, Esquire.

Richard Scott is an attorney with Osman & Associates, a law firm of approximately

twenty staff counsel for Travelers Insurance Company, which handles personal injury and large

fire losses over one million dollars.  (Scott Deposition Testimony Read at Trial ["Scott"] April

23, 2012 ["4/23/12"], 9:1-10:11.)  Osman & Associates retained Dr. Graboff to review records,

examine patients and draft reports.  (Id. at 14:3-13.)  The firm also used Plaintiff as an expert

witness to testify in depositions and at trial.  (Id. at 14:14-20.)  Scott was never dissatisfied with

the work performance of Plaintiff.  (Id. at 18:2-14.)  Nonetheless, Scott has not hired Plaintiff in

the past two years.  (Id.)  One consideration for Scott in hiring experts is whether they have been

suspended or expelled from any professional association. (Id. at 24:2-8.)  Scott testified that his

firm was told by employees of Travelers not to use Dr. Graboff as a result of his suspension.  (Id.

at 22: 21-22.)  Specifically, Scott was told not to hire Plaintiff again because of "the problem"

Dr. Graboff was having with the AAOS, mainly that he was being "kicked out" or "suspended."

(Id. at 18:2-14.)

Kevin McGowen is an attorney with USAA Insurance and serves as the executive director of staff counsel operations. (McGowen Testimony Read at Trial ["McGowen"] April 23, 2012 ["4/23/12"], 27:6-8.) McGowen previously retained Plaintiff in a number of cases as an orthopaedic expert to review records and perform Independent Medical Examinations. (Id. at 29:3-30:6.) McGowen testified that he was aware of Dr. Graboff's AAOS suspension and doubted USAA Insurance has used him as an expert since. (Id. at 32:19-21, 33:9-11.)

Steven Levine is an attorney for Allstate Insurance who had retained Plaintiff as an expert. (Levine Deposition Testimony Read at Trial ["Levine"] April 23, 2012 ["4/23/12"], 34:23; 39:11.) Levine has not hired Plaintiff since approximately the end of 2009 or early 2010. (Id. at 40:19.) Levine told Plaintiff that Allstate Insurance would no longer use him because of "a problem between him and this organization that had become an issue in one of our cases. And we just wanted to avoid that." (Id. at 41:5-20.)

### G. Testimony of Gregory Cowhey

Gregory Cowhey is a financial analyst and forensic economist employed by CBIZ Mayer Hoffman McCann, an accounting firm. (Gregory Cowhey Trial Testimony ["Cowhey"] April 23, 2012 ["4/23/12"], 42:15-43:7; 47:24-48:2.) Cowhey testified as an expert on the issue of Plaintiff's economic loss as a result of his suspension. (Id.) In analyzing the economic loss of Dr. Graboff, Cowhey testified that "[w]hen you see the fall off of collections in the first quarter of 2009 and the number of cases go from 260 a year to 120 a year, it's pretty clear that there was an event which caused a decrease in earning and earning capacity." (Id. at 96:3-6.) Further, Cowhey testified that Plaintiff's "practice was a 1.2 million dollar practice generating 800,000 dollars in profits for him. In the most recent year, it was a 960,000 dollar practice generating

600,000 of profits.  There's . . . a significant decrease [in profits] no matter how you want to measure it." [11]  (Id. at 100:21-25.)

## III.    STANDARD OF REVIEW

Defendant has filed a Post-Trial Motion "for Judgment as a Matter of Law and for Judgment Notwithstanding the Verdict pursuant to Federal Rules of Civil Procedure 50(b) and 59, and requests that judgment be entered in AAOS's favor on Dr. Graboff's claim of false light invasion of privacy. . . ."  (Doc. No. 38 at 1.)

In ruling on a Federal Rule of Civil Procedure 50(b) motion, the court must determine "whether 'viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'"  See Eshelman v. Agere Sys., Inc., 554 F.3d 426, 433 (3d Cir. 2009) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)). Judgment as a matter of law should be granted "where the 'record is critically deficient of the minimum quantum of evidence in support of the verdict.'"  Id. (quoting Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995)). "[I]n performing this narrow inquiry, [the court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury."  Id. (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)); see also Ambrose v. Twp. of Robinson, Pa., 303 F.3d

---

[11] Defendant's expert witness, Marc Weinstein, rebutted the testimony of the forensic economist and Plaintiff about his income.  According to Weinstein, the records — including the expert report of Cowhey, individual tax returns of Dr. Graboff for 2001-2010 and corporate tax returns of Graboff M.D., Inc. for 2001-2010 — show "there was no economic loss associated with the subject incident."  (Marc Weinstein, April 23, 2013, 191:18-20.)  Weinstein found that before Dr. Graboff's suspension the gross income of his business averaged about $1,100,000, and Dr. Graboff's earnings averaged about $550,000. (Id. at 195-96.)  Subsequent to the suspension, Weinstein found Dr. Graboff still paid himself $550,000 on average, despite the business suffering "somewhat of a loss."  (Id. at 196.)

488, 492-93 (3d Cir. 2002).  In ruling on a Rule 50 motion, a court must review the entire trial record, drawing all reasonable inferences in favor of the nonmovant.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149 (2000).

Entry of judgment as a matter of law is a "sparingly" invoked remedy.  CGB Occup. Therapy, Inc. v. RHA Health Servs., Inc., 357 F.3d 375, 383 (3d Cir. 2004).  However, more than a "scintilla of evidence" is needed to sustain a liability verdict.  Id.; see also Ambrose, 303 F.3d at 492; see also Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003) (describing the legal standard for a Federal Rule of Civil Procedure 50 motion).  "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."  Eshelman, 554 F.3d at 433 (quoting Gomez, 71 F.3d at 1083).

Defendant seeks, in the alternative, judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 59.  Federal Rule of Civil Procedure 59 does not cover a judgment notwithstanding the verdict, but rather addresses motions for a new trial under 59(a) or to alter or amend a judgment under 59(e).  Assuming Defendant cited Rule 59 in an effort to be awarded a new trial pursuant to Federal Rule of Civil Procedure 59(a), the Rule provides in relevant part as follows:

(a) In General.

(1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues — and to any party — as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court;

A new trial may be granted "when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand or

when the court believes the verdict results from jury confusion." Brown v. Nutritional

Mgmt. Servs. Co., 370 F. App'x 267, 269-70 (3d Cir. 2010) (quoting Pryer v. C.O. 3

Slavic, 251 F.3d 448, 453 (3d Cir. 2001); Nissho-Iwai Co., Ltd. v. Occidental Crude

Sales, 729 F.2d 1530, 1538 (5th Cir. 1984)).  However, "[a] new trial cannot be granted

. . . merely because the court would have weighed the evidence differently and reached a

different conclusion." Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231,

1235 (E.D. Pa. 1992).

Alternatively, Defendant may have cited Rule 59 in seeking to alter or amend a

judgment pursuant to Federal Rule of Civil Procedure 59(e).  The Rule provides as

follows: "A motion to alter or amend a judgment must be filed no later than 28 days after

the entry of the judgment."  Fed. R. Civ. P. 59(e).  A party moving for reconsideration of

a court's decision must demonstrate "at least one of the following grounds: (1) an

intervening change in the controlling law; (2) the availability of new evidence that was

not available [previously]; or (3) the need to correct a clear error of law or fact or to

prevent manifest injustice." Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176

F.3d 669, 677 (3d Cir. 1999) (citing N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194,

1218 (3d Cir. 1995)).  "Because of the courts' interest in the finality of judgments,

motions for reconsideration should be granted sparingly." Tomasso v. Boeing Co., No.

03-4220, 2007 U.S. Dist. LEXIS 62492, at *2 (E.D. Pa. Aug. 24, 2007) (citing United

States v. Bullock, No. 98-5023, 2005 U.S. Dist. LEXIS 1833, at *1 (E.D. Pa. Jan. 24,

2005)).  Since the Court has already ruled on several motions adversely to Defendants,

such as one for summary judgment (Doc. Nos. 80, 102) in which the doctrine of

economic necessity was argued, Defendants may have filed a motion pursuant to Rule 59(e) believing that such a motion was appropriate.

## IV.   DISCUSSION

In seeking a judgment as a matter of law and a judgment notwithstanding the verdict Defendant AAOS makes several arguments: 1) liability for a false light claim requires findings that the statements were both false and portrayed Plaintiff in a false light, and Plaintiff has not proven the statements were false; 2) there was no evidence that the AAOS Now article portrayed Plaintiff in a false light; 3) the AAOS Now article was subject to a conditional privilege, which is an absolute defense to the false light claim; and  4) the Court should not intervene in the affairs of voluntary association because Plaintiff has not proven an economic necessity.  Plaintiff asserts that these arguments do not warrant the relief requested.  The Court will address each argument seriatim below.

### A.  False Light Claim

#### 1.   Choice of Law Analysis

As a preliminary matter, the Court must determine whether to apply Pennsylvania or Illinois law to the false light claim.  Defendant contends that Illinois law should apply to all claims in this action — including the false light claim — while Plaintiff submits that Pennsylvania law governs.  Defendant concedes that "Illinois and Pennsylvania law are consistent with respect to a false light claim."  (Doc. No. 137 at 7 n.1.)

In general, a federal court, sitting in a diversity action or with supplemental jurisdiction over a common law claim, must apply the choice of law rules of the forum state.  See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941); Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).  Accordingly, the Court will apply Pennsylvania choice of law rules to this dispute.

Under Pennsylvania choice of law rules, the Court must first determine whether a true conflict exists.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir.2007) (noting "the first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws.").  If there is no true conflict, no further choice of law analysis is necessary and the law of Pennsylvania, as the forum state, would apply.  Id.

Here, Defendant agrees that Illinois and Pennsylvania law are consistent with respect to the false light claim.  (Doc. No. 137 at 7 n.1.)   Illinois, like Pennsylvania, has adopted the definition of false light set forth in the Restatement (Second) of Torts § 652E.  Lovegren v. Cit. First Nat'l Bank of Princeton, 534 N.E.2d 987 (Ill. 1989).  The elements of the false light claim are the same in Illinois and Pennsylvania.  Id. at 989.  Accordingly, because no true conflict exists, the Court will apply Pennsylvania law to the false light claim.  See Hammersmith, 480 F.3d at 230.

### 2.        Actual Falsity is Not a Required Element of a False Light Claim

Pennsylvania recognizes four types of invasion of privacy actions: (1) intrusion upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life; and (4) publicity placing a person in a false light.  Fanelle v. LoJack Corp.,79 F. Supp. 2d 558, 563 (E.D. Pa. 2000).[12]  Here, Plaintiff has made a false light claim.  Pennsylvania has adopted the Restatement (Second) of Torts definition of the tort of false light, which states as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if
>
> (a) the false light claim in which the other was placed would be highly offensive to a reasonable person, and

---

[12] Illinois also recognizes the same four types of invasion of privacy.  Lovegren, 534 N.E.2d at 987.

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E.

The Pennsylvania Superior Court has addressed the issue of whether falsity is a required element of a false light claim in <u>Larsen v. Philadelphia Newspapers, Inc.</u>, 543 A.2d 1181 (Pa. Super. Ct. 1988).  In <u>Larsen</u>, various news sources published articles about the plaintiff who was Chief Justice of the Pennsylvania Supreme Court.  <u>Id.</u>  The plaintiff claimed the articles portrayed him in a false light.  <u>Id.</u>  In analyzing the false light claim, the court found, in relevant part, as follows:

> [O]ur review of the writings and case on the subject at hand also gives credence to the tenet that recovery in tort for the disclosure of public, as well as private, facts, even though they be true, is warranted to protect a claimant's right to be free from being placed in a false light and incurring the resultant mental suffering, shame or humiliation which may be caused by the discriminate publication of such facts.
>
> . . .
>
> The falsity with which we are concerned arises from the inference derived from published statements, whether those statements are actually true or not.  We find that the element of falsity is met if the plaintiff alleges that the defendant knowingly or recklessly selectively printed or broadcast true statements or pictures in a manner which created a false impression.  To permit an editor to publish misleading portions of the truth is the equivalent of sanctioning the promulgation of falsehoods under the guise of the First Amendment. . . . This is evident from the fact that in the print media, the passages selected for deletion and modification . . . can cause a dramatic change in the impression which the final article will generate in the minds of the average reader. And these editing decisions are calculated ones made by the editors to comport with the tone of the magazine desired.
>
> In other words, despite the accuracy of the facts disseminated, discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed.

Id. at 1189 (internal citations and quotations omitted).  Larsen makes clear that a grievant may recover for a false light claim when true facts are disseminated in a way which creates a false impression.

Larsen has been cited by a court in this District for the very proposition that Pennsylvania law recognizes a false light claim even when the information is true, if falsehoods are implied. Morgenstern v. Fox Television Stations of Phila., No. 08-0562, 2008 U.S Dist. LEXIS 92990 (E.D. Pa. Oct. 31, 2008).  In Morgenstern, the plaintiff sued various news sources for false light stemming from articles reporting that he had inappropriate contact of a sexual nature with a minor over the internet.  After discussing the types of invasion of privacy actions available in Pennsylvania, the court quoted the definition of "false light" found in the Restatement of Torts (Second).  The court then cited Larsen for the proposition that the Pennsylvania Superior Court has "recognized that a false light claim can be established, even if the information released is true, if the information tends to imply falsehoods."  Id. at *29.  The court denied motions to dismiss the false light claim, finding that the plaintiff satisfied both elements of a false light claim because: 1) the article containing his alleged conduct would be highly offensive to a reasonable person; and 2) the media had knowledge of or acted with reckless disregard of the falsity.  Other courts applying Pennsylvania law have similarly concluded that the tort of false light requires either a "false statement or imputation," again suggesting that a statement which is false or imputes a falsity is sufficient for a false light claim.  See, e.g. Weinstein v. Bullick, 827 F. Supp. 1193, 1202 (E.D. Pa. 1993); see also Bromhall v. Rorvik, 478 F. Supp. 361, 367 (E.D. Pa. 1979).

Larsen was also relied on by the United States Bankruptcy Court for the Western District of Pennsylvania in a false light case applying Pennsylvania law.  In re Lansaw, 424 B.R. 193 (Bankr. W.D. Pa. 2010).  Lansaw explained Pennsylvania law regarding false light as follows:

> In applying the requirements of § 652E of the Restatement, the Pennsylvania Superior Court has held that the element of falsity is met if the plaintiff alleges that the defendant knowingly or recklessly selectively printed or broadcast true statements or pictures in a manner which created a false impression. To demonstrate that a communication implies falsehood a plaintiff must show discriminate publication of true statements. In other words, the defendant must have created a false impression by knowingly or recklessly publicizing selective pieces of true information.  The question becomes whether the statements were presented in a discrete manner which would allow the publication to be interpreted with inferences casting the plaintiff in a false light.

Id. at 198 (internal citations and quotations omitted).  Therefore, the Court found that it must "ultimately [be] determined that the statements are false or that they could be interpreted in such a manner as to imply falsehood."  Id. at 199.

Here, Defendant relies on Doe v. Wyoming Valley Health Care System, Inc., 987 A.2d 758 (Pa. Super. Ct. 2009) to support their claim that a false light claim requires falsity.  Doe does not stand for the proposition that Pennsylvania law requires an actual false statement be the basis of a false light claim.  Rather, Doe cites to "Comment a" to the Restatement (Second) of Torts § 652E, which states in relevant part "it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true."  In citing to this Comment, Doe converts it to:  "under Section 652E, it is essential that the matter published concerning the plaintiff is false."  Id. at 766.  However, the truth or falsity of the statement was not at issue in Doe, thus this one sentence is at best dicta which is not dispositive of the Superior Court's holding.  A literal reading of the quote in Doe is contrary to the majority of precedent cited above, which require that a false impression can be created even if the facts are true.  This is one way in which the tort of false light may be proven.

Defendant also cites to <u>Lovegren v. Citizens First National Bank of Princeton</u>, 534 N.E.2d 987 (Ill. 1989) for the proposition that, under Illinois law, statements must be false to constitute false light.  (Doc. No. 137 at 7.)  <u>Lovegren</u>, however, does not directly address whether a false light claim requires proof of actual falsity.  <u>Lovegren</u>, 534 N.E.2d 987.  In <u>Lovegren</u>, a customer filed an invasion of privacy action against a bank that placed advertisements in local newspapers without the customer's consent.  The advertisement stated that the customer was selling his farmland at a public auction.  <u>Id.</u>  The court found that advertisements in the local newspapers were sufficiently public and statements in the advertisement were untrue because the customer did not intend to sell his farm.  <u>Id.</u> at 990.  Further, the court determined a finder of fact could have decided that the advertisement was highly offensive to a reasonable person.  <u>Id.</u>  The court concluded that the facts presented satisfied the elements of a false light claim.  <u>Id.</u> at 989.  Because in <u>Lovegren</u> the statements at issue were false, the court did not address whether actual falsity is a required element of a false light claim.  Defendant cites no other Illinois case for the proposition that proof of actual falsity is necessary to prove a false light claim and this Court is unable to locate any case to that effect.

In this case, the Court instructed the Jury on the false light claim using the language of the Pennsylvania Suggested Standard Jury Instruction (Fourth Edition) Section 17.220 as quoted above.  Accordingly, the verdict slip presented to the Jury required a finding that the statements made by the AAOS about Plaintiff were false <u>or</u> portrayed Plaintiff in a false light.  If the Jury found either falsity or portrayal in a false light, they were to answer the questions that followed regarding intent and damages.  Defendant challenges the verdict sheet as flawed with respect to the false light claim, asserting actual falsity is required, not just statements which falsely portray a person.  Pennsylvania law, however, does not require only proof of false statements for a false

light claim. A false impression may also be proven.  Consequently, Defendant's arguments that actual falsity is a required element of a false light claim, or that this Court erred in instructing the Jury regarding the false light claim and in using a verdict sheet which permitted the jury to find a false light violation without an actual false statement must fail.

### 3.    The Evidence is Sufficient to Prove the False Light Claim

There was ample evidence at trial to support the Jury's finding that Plaintiff has established the false light claim.  Plaintiff testified about the misrepresentations and incompleteness of the content of the <u>AAOS Now</u> article.  They are evident from the chart on pages 21 to 22 of this Opinion in the Statement of Facts under the subheading: "Dr. Graboff Describes the False Information In, and Impressions From, the AAOS Article."  A selection from the article is matched with Dr. Graboff's testimony about it.  The selections and testimony show how the article gives the impression that Dr. Graboff wrote a misleading report.  They prove that the article implied that Plaintiff had information at the time he drafted the report, which he intentionally omitted, leaving the reader with the impression that Plaintiff was sloppy or overlooked facts.  Dr. Graboff testified that the information was not available to him when he drafted the report.  Overall, the evidence shows, and a reasonable jury could find, that the article gives the false impression through manipulation of facts that Plaintiff was dishonest, reckless or an inaccurate expert, which would be highly offensive to a reasonable person.

Plaintiff also presented sufficient evidence that Defendant had knowledge of or acted in reckless disregard of the false light in which Dr. Graboff would be portrayed.  The AAOS knew of Dr. Graboff's long history as an expert testifying on behalf of plaintiffs and against orthopaedic surgeons.  Defendant also knew the report authored by Plaintiff in the <u>Jones</u> matter was a "**<u>DRAFT REPORT</u>**" which the Colleran Defendants misrepresented as a final report for purposes of settlement negotiations.  Moreover, as testified to by Dr. Graboff, the way certain

information was portrayed in the AAOS Now article permitted the jury to infer reckless conduct on the part of Defendant.  For example, Dr. Graboff testified that the article omits crucial information, describes information not available to him at the time he drafted the report and implies he contradicted his initial expert opinion.  Overall, Dr. Graboff testified that article was misleading and left readers with the false impression that he was reckless or wrote an inaccurate expert report.  Viewing all this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant acted with knowledge or with reckless disregard of the fact that the article created a false impression of Dr. Graboff.  Accordingly, the evidence was sufficient to prove the false light claim, and there is no basis to set aside the jury's verdict.

**4.    Publication of the AAOS Article to the Public on the Internet is Not Privileged**

Defendant argues that it had a conditional privilege to publish the AAOS article and relies on a Bylaw which states:

> For all professional compliance actions taken by the Board of Directors . . . the ASSOCIATION shall notify the Respondent's state licensing board, state medical society, the American Board of Orthopaedic Surgery, and, as appropriate, other medical associations.  For any professional compliance action relating to patient health or welfare, the ASSOCIATION shall notify the National Practitioner Data Bank.  At least annually, the Association shall notify . . . Members of all professional compliance actions taken, identifying the respondent by name.

(Pl. Ex. 35 ¶ 8.6.)  Defendant argues that this language binds Plaintiff as a member of the association and constitutes his consent to, and justification for, Defendant publishing the AAOS Now article about his suspension. Under the Restatement (Second) of Torts § 583, also relied on by Defendant, "consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."  Therefore, Defendant contends that the consent of Dr. Graboff to publication of the article, given under the above Bylaw, is a complete defense to the alleged defamatory statements made in the AAOS Now article.  Id.  The AAOS asserts that

35

under Pennsylvania law, this rule even applies to false claims, citing <u>Buschel v. Metrocorp</u>, 957

F. Supp. 595, 598-99 (E.D. Pa. 1996) (finding communications of an attorney in pursuing the

interests of a client are privileged and therefore protected from liability arising from allegations

of defamation and false light).

The position of Defendant is untenable for several reasons.  First, the plain language of

the Bylaws mandate notification of members of disciplinary actions, not notification to the

public.  The evidence at trial demonstrated that the <u>AAOS Now</u> article about Plaintiff's

suspension was available to the public on the internet.  It was published on the public portion of

the AAOS website which is accessible to anyone.  Thus, Plaintiff did not consent to the

publication of disciplinary action against him to the public or to the manner in which it was

disseminated by Defendant.

Second, Defendant argues that a conditional privilege applies to the false light claim

because the publication of the <u>AAOS Now</u> article was in furtherance of a legitimate interest of

the organization.  Under the Restatement (Second) of Torts:

> An occasion makes a publication conditionally privileged if the circumstances
> induce a correct or reasonable belief that[:]
> (a)  there is information that affects a sufficiently important interest of the
>      publisher, and
> (b)  the recipient's knowledge of the defamatory matter will be of service in the
>      lawful protection of the interest.

Restatement (Second) of Torts § 594.

Defendant's reliance on conditional privilege under section 594 is also misplaced.  Dr.

Mandell and other defense witnesses testified that the purpose of publication of disciplinary

proceedings is to educate AAOS members of the mistakes of other members in order to avoid

future violations.  (Mandell, 4/19/12, 167-71; Hackett, 4/20/12 at 88-89; Parks, 4/20/12 at 35.)

As such, there may be an important interest in publishing an article to AAOS members.

However, this interest does not extend to making the article available to the public.  No defense witness provided any credible explanation of why the article should be disseminated to the public in general.  Thus, Defendant's arguments for applying here a conditional privilege are unpersuasive.

### B.  Doctrine of Economic Necessity

#### 1.  Choice of Law Analysis

Defendant's final argument is that this Court should have dismissed this case and not intervened by allowing it to go forward because the AAOS is a voluntary organization and Plaintiff failed to establish an economic necessity requiring judicial intervention.[13]  Under the doctrine of economic necessity, courts do not interfere in the actions of a voluntary association unless an important economic interest is at stake.

As a preliminary matter, the Court must first determine whether to apply Pennsylvania or Illinois law to Defendant's argument on the doctrine of economic necessity.  As noted, Defendant asserts that Illinois law should apply to all claims in this action, while Plaintiff contends Pennsylvania law governs.

As stated previously, in general, a federal court, sitting in a diversity action or with supplemental jurisdiction over a common law claim, must apply the choice of law rules of the forum state.  See Klaxon Co., 313 U.S. at 497; Berg Chilling Systems, Inc., 435 F.3d at 462.  Accordingly, the Court will apply Pennsylvania choice of law rules to this dispute.

Here, Defendant argues that the AAOS is a voluntary organization and Plaintiff failed to establish an economic necessity warranting the intervention of the Court.  When Plaintiff became a member of the association, a contractual obligation under the Bylaws of the association was created.  See Austin v. Am Ass'n of Neurological Surgeons, 253 F.2d 967, 969 (7th Cir. 2001)

---

[13] The parties agreed that economic necessity is an issue for the Court, not the jury, to determine.

(explaining "violation of . . . bylaws . . . is just another way of assimilating voluntary-association law into contract law.")   The AAOS Bylaws contain a choice of law provision, providing that Illinois law applies:

> Membership status in the ASSOCIATION is governed by the law of the State of Illinois, where the offices of the ASSOCIATION are located.  The law provides that an applicant may not seek judicial review of an adverse membership decision except where membership is an economic necessity.

(Pl. Ex. 36 at 113, April 23, 2013 Trial Transcript, 147:14-21.)

In determining whether to enforce this contractual provision in the Bylaws, the Court looks to the choice of law principles of the forum state, Pennsylvania.  Gay v. CreditInform, 511 F.3d 369, 389 (3d Cir. 2007).  "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."  Id.  (internal citations and quotations omitted).  Specifically, Pennsylvania courts uphold choice of law provisions unless: 1) the chosen state has no substantial relationship to the parties or transaction and there is no reasonable basis for the choice of law, or 2) the application of the chosen law would be contrary to fundamental policy of a state with a materially greater interest.  Id.  Here, Defendant is located in Illinois and the contract governing the parties — the Bylaws — provides that Illinois law applies.  Moreover, the hearings before the Committee on Professionalism and the AAOS Board regarding the Grievance filed against Dr. Graboff were held in Illinois.  Illinois therefore has a substantial relationship to the parties and interest in this case.  Pennsylvania does not have a materially greater interest in this case or relationship to the parties.  In addition, applying Illinois law would not be contrary to a fundamental policy of Pennsylvania.  Thus, the Court will apply Illinois law with respect to Defendant's economic necessity argument.

**2.      The Doctrine of Economic Necessity is Not a Defense to a False Light Claim**

First and foremost, however, is that the doctrine of economic necessity is not a defense to a false light claim.  Voluntary associations, such as the AAOS, are given wide latitude in conducting internal affairs and courts generally do not intervene in the actions of an association when conducted in compliance with internal procedures.  Van Daele v. Vinci, 282 N.E.2d 728, 731 (Ill. 1972).  Judicial review, however, is at times required.  Id.  When a Plaintiff alleges an important economic interest was affected by an improper administrative proceeding, a court has the "power and duty to act."  Id. at 731.  Another reason judicial review or a court proceeding may be appropriate is because no organization has the right to defame or portray a member in a false light.

In Austin v. American Association of Neurological Surgeons, 253 F.3d 967 (7th Cir. 2001), relied upon by Defendant, the court distinguishes between the doctrine of economic necessity being based on contract principles rather than on tort remedies and stated as follows:

> [w]here the absence of an "important economic interest" deprives the disciplined member of the special protections of Illinois voluntary-association law, he has recourse to defamation law should the discipline falsely impugn his professional competence, . . . including his competence to testify responsibly on issues within the scope of his professional expertise.  If [Plaintiff] was wronged by the Association, he had remedies, but not under the Illinois law of voluntary associations.

Id. at 973 (internal citations omitted); see also Sanjuan v. Am. Board of Psychiatry, No. 93-5806, 1994 U.S. Dist. LEXIS 2449 (N.D. Ill. March 3, 1994) (deciding defamation claim on merits when the doctrine of economic necessity was raised).  Thus, even if this Court found Plaintiff had not proven an economic interest, it is clear that judicial intervention is still warranted to afford Plaintiff protection from being portrayed in a false light.

Moreover, the contract in this case is the AAOS Bylaws.  There is no provision in the Bylaws which allows AAOS to portray a member in a false light.  It was not contracted for by Dr. Graboff when he joined the organization and the Bylaws never changed to permit holding a member in a false light.  Section 5.6 of the AAOS Bylaws states that, "[m]embership status . . . is governed by the law of the State of Illinois." (Pl. Ex. 36 at 113, April 23, 2013 Trial Transcript, 147:14-21.) Section 5.6 of the Bylaws also reminds a member that the "law provides that an applicant may not seek judicial review of an adverse membership decision except where membership is an economic necessity."  (Id.)  Section 5.6 deals with membership in the AAOS. The terms "membership status" and "adverse membership decision" are used.  (Id.)  This language refers to internal decision-making of the association about its members.  It does not cover portraying a member in a false light, even if an internal membership decision is "adverse" to the member.[14]  Accordingly, the AAOS had no right to portray Dr. Graboff in a false light and the doctrine of economic necessity, which is based in contract principles rather than tort remedies, is not a defense to such a tort.

### 3.      Plaintiff Has Proven an Economic Necessity

Even if the doctrine of economic necessity were applicable to the false light claim, which it is not, Plaintiff has still proven that his suspension was an economic necessity.  An analysis of the law on the doctrine of economic necessity follows.

First, in applying Illinois law, the primary resource is an opinion from the Illinois Supreme Court.  Van Daele v. Vinci, 282 N.E.2d 728 (Ill. 1972).  Van Daele held that judicial

---

[14] In addition, Article III of the Bylaws also deals with status of membership and says "membership in the ASSOCIATION is a privilege, not a right, and is dependent upon the applicant adequately demonstrating compliance with . . . the Bylaws, the Rules and Regulations, Standards of Professionalism and the policy statements as adopted by the ASSOCIATION."  (Pl. Ex. 36 at 110, April 23, 2013 Trial Transcript, 147:14-21.)  Once again, this Bylaw refers to regulating "membership."  It does not permit the AAOS to portray a member in a false light.

40

intervention is appropriate when the "opportunity [to earn a] livelihood" is at stake.  In <u>Van Daele</u>, the board of a private voluntary organization of independent retail grocers, whose purpose was to secure lower grocery prices and rebates through large volume purchases, expelled two of its members.  <u>Id.</u> at 730.  The expulsion placed the plaintiff grocer at a competitive disadvantage by denying him access to volume discounts that the association obtained from its suppliers which put his business in jeopardy.  The court found that when "an important economic interest of the plaintiffs was affected by an improper administrative proceeding . . . the court [has the] power and the duty to act."  <u>Id.</u> at 731.  In reaching this decision, the court relied on a decision of the Supreme Court of New Jersey which noted in relevant part:

> We are here concerned with and therefore deal solely with an organization, membership in which may here . . . be viewed as an "economic necessity"; in dealing with such an organization, the court must be particularly alert to the need for truly protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objective of the organization.

<u>Id.</u> (citing <u>Falcone v. Middlesex Cnty. Med. Soc.</u>, 170 A.2d 791, 796-97 (N.J. 1961)).

A secondary resource is decisions of other courts relying on Illinois law.  For example, in <u>National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.</u>, 779 F.2d 1281 (7th Cir. 1985), a trade association, whose primary purpose was to promote the interests of sporting good wholesalers, did not allow an associate member of the organization, FTL, to be an exhibitor in its annual trade show.   <u>Id.</u> at 1282-83.  The court found there was a contractual relationship between the association and FTL and noted that courts do not normally review actions of a voluntary association with respect to its members.  <u>Id.</u> at 1285.  The court held, however, that when there is an economic necessity at issue, judicial intervention is warranted. <u>Id.</u>  In describing the concept of economic necessity, the court stated as follows:

> If the association enjoys monopolistic power, the courts will ensure that such power is exercised according to principles of "procedural fairness." Thus, the judiciary will intervene when the association has an economic "stranglehold" on the relevant market. Otherwise, the judiciary will rely on market forces to govern the actions of the association.

Id. (internal citations omitted). The court was persuaded by the following evidence:

1) many small manufacturers do not belong to the association; 2) the trade show was not "unique or superior;" and 3) there are a number of other industry trade shows. Id. Therefore, the court held judicial intervention was not appropriate in this case because FTL failed to demonstrate "that the association wielded substantial power in the sporting goods industry, much less that membership in the Association was an economic necessity for the associate members [such as FTL]." Id.

Even in Austin v. American Association of Neurological Surgeons, 253 F.3d 967 (7th Cir. 2001), the court noted, "[a]t the very least, the association's action must jeopardize the principal source of the professional's livelihood, and not a mere sideline." Id. at 971-72 (internal citation omitted).[15]

The precedent shows that application of the doctrine of economic necessity is far from one size fits all and depends on the facts of each case. Here, based on the record made in this case, it is evident that the AAOS has intruded itself into the marketplace of orthopaedic surgeons

---

[15] In Austin, the court held that Dr. Austin, a member of the American Association of Neurological Surgeons, failed to show an "important economic interest" was at stake in challenging his suspension. In Austin, the court perceived a thirty-five percent drop in income from testifying as income from moonlighting as an expert, "income from a sideline to his primary profession, which is that of a neurosurgeon, not an expert witness." Id. at 971-72. Austin apparently maintained his neurological practice while "moonlighting" as an expert to increase his income. In this case, Dr. Graboff was largely transitioned to a full-time expert and was closing down his orthopaedic practice at the time of his suspension. The Austin decision contains considerable dicta, which does not appear to advance the legal reasoning on the core issue in that case.

who earn a living testifying as experts, which according to Dr. Graboff, are few in number. The Standards of Professionalism promulgated by the AAOS are all-encompassing and written in such a broad manner that virtually all expert conduct falls within its ambit, creating a situation where everything an expert witness says or does potentially is subject to AAOS review. The AAOS is well aware of its clout in the profession of orthopaedic surgeons and created its compliance program and standards to control the occupation of its members as experts.[16] It is also aware that its enforcement program and standards would affect the income of doctors because the loss of AAOS accreditation has a substantial impact on the ability of an expert to work in that industry. Further, the presence of the standards alone, however noble they are as a mission statement, can have a chilling effect on orthopaedic surgeons who serve as expert witnesses against other orthopaedic surgeons. Although the AAOS has a grievance system with different levels of review, the evidence in this case shows a flaw in the system which can dramatically affect the livelihood of a member because when the grievance against Dr. Graboff was ultimately summarized in the AAOS article, it portrayed him in a false light.

In this case, when viewing the evidence in the light most favorable to Plaintiff, there is substantial evidence to demonstrate that Dr. Graboff earned his livelihood as an expert witness. Based on the evidence in this case, when an expert like Dr. Graboff, who was practically offering his expert services full-time, is a member of the AAOS, it is necessary to maintain that membership in order to continue to practice his chosen profession. Plaintiff testified that over a decade ago he made an active decision to greatly reduce his orthopaedic and surgical practice in order to focus his career on orthopaedic forensic and expert work. Prior to his suspension, Dr.

---

[16] The AAOS Bylaw, noted above, that members may not seek judicial review except where membership is an economic necessity implicitly recognizes that the AAOS is aware of the clout it has over its members and its ability to impact their livelihood.

Graboff worked as an expert for over 500 clients including law firms and insurance carriers such as Allstate Insurance, USAA Insurance and Travelers Insurance.  After his suspension and the publication of the <u>AAOS Now</u> article on the internet, his considerable client base terminated. His clients informed him that his expert services in pending litigation would be detrimental and no longer would be required.  One client, attorney Joseph Crosby, wrote a letter to Dr. Graboff informing him that due to his suspension, his continued service as an expert in a pending matter would be a "disastrous influence" on the outcome of the case.  (Graboff, 4/16/12, AM Session, 118-120.)  Some clients even requested that Plaintiff return fees accrued or prepare to face litigation.  (Graboff, 4/17/12 at 120:6-25.)  In fact, three former clients of Dr. Graboff testified that despite good work product, none of them have hired him since his suspension.  (4/23/12 at 18, 32-33, 40.)  Many other clients would not hire him in the future and he was compelled to rebuild his business.  Now, Plaintiff must do a substantial amount of marketing to maintain business and continuously works with new smaller clients and earns significantly less income. (<u>Id.</u> at 116: 9-14.)  Dr. Graboff has lost the job security he once had as an expert because the AAOS has given any potential opponent a "huge amount of ammunition" against him and clients are therefore wary of hiring him.   (<u>Id.</u> at 121: 25, 123:22; Graboff, 4/16/12, AM Session at 127.)

Defendant argues that an examination of Dr. Graboff's income tax returns shows that his income prior to and after his suspension was the same and therefore he has not proven an economic necessity.  Plaintiff counters that there was a significant impact on his expert consulting income and client base and that his suspension jeopardized and greatly diminished the principal source of his livelihood.  Even if Defendant is correct about Dr. Graboff's overall income being the same, Defendant overlooks the critical fact that a person has a right to earn a living in the specific area he chooses.  Dr. Graboff chose to earn his livelihood full-time as an

expert.  Because he has the ability and entrepreneurial spirit to increase his income by other means, such as returning to the practice of medicine, does not mean that he has not demonstrated an economic necessity.  A person should not be forced to earn a living in an occupation different from the one which is the source of his livelihood.  This is what happened to Dr. Graboff as a result of the AAOS grievance process, which jeopardized his primary source of livelihood.

The evidence shows that the intrusion of the AAOS into the marketplace of expert orthopaedic surgeons is substantial and jeopardized Dr. Graboff's source of income as an expert. Thus, the argument of Defendant that judicial intervention is not warranted here because Dr. Graboff has not demonstrated an economic necessity is at stake is not persuasive.

## V.    CONCLUSION

For reasons stated above, the Court will deny Defendant's Motion.   An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN R. GRABOFF, M.D.,

                Plaintiff,

    v.

THE COLLERAN FIRM, et al.,

                Defendants.

CIVIL ACTION
NO. 10-1710

## ORDER

      **AND NOW**, this 28th day of March 2013, upon consideration of the Post-Trial Motion of Defendant AAOS Pursuant to Federal Rules of Civil Procedure 50(b) and 59 for Judgment as a Matter of Law (Doc. No. 137), Plaintiff's Response in Opposition (Doc. No. 155), and Defendant's Reply (Doc. No. 157), and in accordance with the Opinion of the Court issued this day, it is **ORDERED** that Defendant's Motion (Doc. No. 137) is **DENIED**.

                                   BY THE COURT:


                                /s/ Joel H. Slomsky
                                JOEL H. SLOMSKY, J.